UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FLORIDA INDEPENDENT COLLEGES AND UNIVERSITIES RISK MANAGEMENT ASSOCIATION, INC. | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 09-1930 (RCL) |
| THE UNITED STATES OF AMERICA and THE INTERNAL REVENUE SERVICE, | ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Before the Court are the parties' cross-motions for summary judgment [16] [17]. The plaintiff, an association of tax-exempt secondary schools and universities in Florida organized to pool risk and obtain insurance, seeks a declaratory judgment that it too is tax-exempt. Upon consideration of the motions, the objections and replies thereto, the applicable law, and the entire record herein, the Court will enter summary judgment in favor of the defendants.

**I.    BACKGROUND**

The plaintiff, Florida Independent Colleges and Universities Risk Management Association, Inc. ("FICURMA"), is a Florida corporation that facilitates provision of insurance to its member organizations. FICURMA filed its articles of incorporation on December 10, 2003, pursuant to Fla. Stat. § 624.4623. That statute, passed in 2003, permits accredited, independent, non-profit colleges, universities, and secondary schools in Florida to form self-insurance funds "for the purpose of pooling and spreading liabilities of its group members in any property or casualty risk or surety insurance" and exempts those funds from the normal rules

1

governing self-insurance funds, including the taxation of premiums, *see id.* §§ 624.4621, 624.509, 624.5092.  FICURMA's articles of incorporation reflects its status as a Florida independent educational institution self-insurance fund, and prohibits the corporation from engaging in activities that would jeopardize its status as a federally tax-exempt corporation under 26 U.S.C. § 501(c)(3).

FICURMA purchases group insurance policies for the benefit of its member institutions and self-insures a certain amount of risk, the self-insured retention ("SIR"), which FICURMA compares to a deductible.[1]  FICURMA asserts that its structure permits member institutions to obtain coverage at reduced rates, and to save on the administrative cost of handling insurance matters individually.  Member contributions are set in accordance with each member's specific risk profile,[2] and contributions exactly cover the costs of the policies, the SIR, and administration; excess contributions are proportionally refunded.  In addition to setting up the insurance scheme, FICURMA additionally administers the policies and supervises claims adjustment.  Full membership is limited to members of the Independent Colleges and Universities of Florida, Inc.; FICURMA has alternated between eight and eleven full members, and has admitted two secondary schools as "associate members."  Some former members have withdrawn from FICURMA, and other institutions have considered but refrained from joining FICURMA.  The board of directors is comprised of one representative from each member institution.

FICURMA applied for tax-exempt status under § 501(c)(3) of the Internal Revenue Code on March 20, 2006.  The IRS responded on January 19, 2007, stating that FICURMA would

---

[1] In addition to taking out insurance for losses in excess of the SIR, FICURMA purchases catastrophic coverage. Member institutions remain free to purchase additional insurance.

[2] Relevant factors include the number of students at an institution; property values and size; vehicle fleets; payrolls and operating expenditures; previous claims and losses; and other unusual exposures.  FICURMA retains the authority to cancel or suspend coverage in the event of a material misstatement by a member institution.

need to amend its articles of incorporation to specify that it is organized exclusively for exempt purposes, that the organization is a non-profit organization that will not engage substantially in politics, and that upon dissolution assets will be distributed for exempt purposes. The IRS further indicated that the articles of incorporation would need to include the following language: "In addition, said organization will operate for the benefit of institutions of higher learning or educational organizations in the State of Florida." FICURMA made the requested amendments on February 5, 2007 and sent notification of the amendments to the IRS on February 16, 2007. The Agency forwarded the application to the EO Rulings & Agreements section on or about May 18, 2007 because of the novel issues presented.

The IRS sent a request for further information on July 17, 2007. The IRS noted that under § 501(m)(1) a "commercial-type insurance company" is not exempt, and solicited details regarding FICURMA's insurance scheme, the relationship between members, the organization's minutes, and other information. FICURMA responded on September 14, 2007. FICURMA argued that it was not a "commercial-type insurance company" but rather a risk pool that purchased third-party insurance for its members at "substantially lower commercial rates" than its members could purchase individually; although it maintained its SIR, it purchased additional insurance from outside companies. FICURMA noted that if its members were all religious-affiliated institutions, it would qualify as tax-exempt under § 501(m)(3)(C). It also asserted that it qualified as exempt under § 501(n) as a charitable risk pool, although it had not complied with § 501(n)'s requirements for charitable start-up capitalization. In the response, FICURMA attached its bylaws, a sample third-party insurance contract, tax documents, minutes, and other information.

The IRS sent its initial adverse determination letter on May 27, 2008. The Agency concluded that FICURMA was organized to "seek[] the prevention or lessening of casualty and property losses for" its members through the creation of a risk management pool. Because FICURMA self-insured a certain level of risk, the IRS determined that FICURMA "provide[d] insurance for" its members and was barred from exemption by § 501(m)(1). Further, although FICURMA would otherwise qualify for exemption under § 501(n), which grants exemption to a "qualified charitable risk pool," it had failed to solicit the requisite charitable startup capital.[3]

FICURMA filed its protest statement on June 25, 2008. It again argued that it did not provide commercial-type insurance but rather purchased insurance from other providers for its members; that it qualified as a charitable risk pool under § 501(n); and that it operated for exempt purposes under § 501(c)(3). FICURMA sent two supplements on September 16, 2008, and October 24, 2008, each of which provided thorough briefing of the relevant legal issues; the latter supplement attached various affidavits from officers at member institutions, legislative history of the Florida bill, and other information. The IRS issued its final adverse determination letter on July 14, 2009. FICURMA filed a complaint [1] in this Court against the IRS on October 13, 2009, seeking a declaratory judgment that FICURMA is eligible for tax-exempt status under the Code. The parties filed the instant motions for summary judgment on June 6 and 7, 2011.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining

---

[3] The IRS also argued alternatively that FICURMA did not qualify as an exempt organization under § 501(c)(3) to begin with.

whether a genuine issue of material fact exists, the trier of fact must view all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

FICURMA argues that the IRS incorrectly denied it tax exempt status. To show its eligibility, FICURMA must establish both that it is an "exempt organization" under 26 U.S.C. § 501(c)(3), and that § 501(m)(1)'s denial of exemption where a "substantial part" of a § 501(c)(3) organization's "activities consists of providing commercial-type insurance" does not apply. Assuming without deciding that the IRS erred in deeming FICURMA outside the ambit of § 501(c)(3), FICURMA would still need to demonstrate that it is not principally engaging in "providing commercial-type insurance."

First, FICURMA argues that it does not "provide" insurance to its members; it merely *purchases* insurance for its members. FICURMA notes that 81 percent of the funds solicited from members go to the purchase of group policies from commercial insurance companies, and that only 19 percent is retained for the SIR, which FICURMA compares to a normal deductible. And, FICURMA stresses, even if the SIR counts as the provision of insurance, it does not constitute a "substantial part" of its activities, which primarily involve the purchasing of outside group plans. Next, FICURMA argues that even if it is "providing" its members with insurance, that insurance is not "commercial-type insurance." FICURMA asserts that the term refers to insurance that is offered to the general public, as opposed to insurance limited to a specific group. Further, FICURMA stresses its small membership; its use of other entities to perform underwriting activities; its lack of advertising and marketing to the general public; and its treatment under Florida law. Accordingly, FICURMA alleges its activities fall outside § 501(m)(1)'s bar.

This contention is squarely contradicted by governing case law.[4] In particular, the Tax Court's ruling in *Paratransit Ins. Corp. v. Commissioner* demonstrates that § 501(m) bars tax exemption for FICURMA. *Paratransit* involved a non-profit association formed under California law to pool risk among its members, § 501(c)(3) organizations providing transportation as a social service to the elderly and the handicapped, among others. The Tax Court conducted an extensive survey of the legislative history behind § 501(m) and stressed a number of points. Most relevant here, the court noted a House report, which provided an example of the sort of institution precluded from exemption by § 501(m): "two or more unrelated tax-exempt organizations pooling funds in a separate entity to be used to satisfy malpractice claims against the organizations." 102 T.C. 745, 753 (T.C. 1994) (quotations omitted). Although the report referred to malpractice claims, it also made frequent reference to insurance generally, and the court found "no basis whatsoever to conclude that automobile liability insurance would not be regarded the same as malpractice insurance in this context." *Id.* Further, the court stressed that the report was "clear" that the term "commercial-type insurance" in § 501(m) "encompasses every type of insurance that can be purchased in the commercial market." *Id.* at 754.

According to the Tax Court, Paratransit Ins. Corp. fell squarely within § 501(m). The non-profit was formed to "shift the risk of potential tort liability from each of the individual insured paratransit organizations to petitioner." *Id.* at 754. Further, the "*type* of insurance petitioner offers is . . . a type of insurance provided by a number of commercial insurance

---

[4] As the IRS notes, Congress provided this Court with jurisdiction to review IRS determinations of tax-exempt status in 26 U.S.C. § 7428. Congress also extended this jurisdiction to the Court of Federal Claims and the Tax Court, with the expectation that the three courts would form a "body of national unified precedents" in which this Court and the Court of Federal Claims "would conform their practice to that of the Tax Court, in view of that tribunal's expertise in such matters." *Virginia Professional Standards Review Foundation v. Blumenthal*, 466 F. Supp. 1164, 1168 (D.D.C. 1979).

carriers." *Id.* (emphasis in original).  In order to provide that coverage, Paratransit "determines member contributions by reference to factors affecting the level of risk ensured by petitioner," and it "directly insures members only up to . . . $100,000 . . . [and c]overage above $100,000 is effected through reinsurance."  Finally, the court found unpersuasive Paratransit's argument that the phrase "commercial-type insurance" only applied to insurance offered to the general public.  Accordingly, the court found Paratransit to be non-exempt.

The Court cannot imagine a factual scenario much more similar to *Paratransit* as the one at issue in this case.  FICURMA, like Paratransit, is a risk pool comprised of § 501(c)(3)-exempt organizations that all provide a common service.  Both self-insure a baseline amount of risk and purchase reinsurance for excess risk.  Both determine member contributions on the basis of each member's unique risk profile.  And the arguments made by the non-profit in *Paratransit* and FICURMA here are nearly identical.  FICURMA does not even try to distinguish *Paratransit*, merely noting that FICURMA raises an additional constitutional argument that Paratransit did not.  If Paratransit was unable to obtain tax-exempt status, then FICURMA must be similarly precluded.  *See also Nonprofits' Ins. Alliance v. United States*, 32 Fed. Cl. 227, 292 ("Congress specifically sought to deny exempt status to group self-insurance pools to ensure that such inherently commercial 'organizations would not enjoy an unfair competitive advantage.'" (quoting *Florida Hosp. Trust Fund v. Commissioner*, 103 T.C. 140, 160 (T.C. 1994), *aff'd on other grounds*, 71 F.3d 808 (11th Cir. 1996))).

An analysis of the statutory text shows the strength of the Tax Court's conclusion.  The Internal Revenue Code does not define the term "providing," and the standard dictionary definition for the word is "to supply or make available."  Merriam-Webster, Provide – Definition, *available at* http://www.merriam-webster.com/dictionary/provide (second transitive

definition). By self-insuring to a certain extent and arranging for group policies for excess risk, FICURMA does exactly that—"supply," or "make available," insurance to its members.

And this insurance is indeed "commercial-type insurance." Although FICURMA leans on legislative history to argue that the term only applies when the institution seeking exemption offers insurance to the public at large, the *Paratransit* court rejected the same argument. As that court noted, the reference in the House report to provision of insurance "to the general public" was deleted in a later Congressional report. Especially in the context of other legislative history—particularly the example of two tax-exempt organizations pooling malpractice risk—a restricted reading of the term "commercial-type insurance" was inappropriate. *Paratransit*, 102 T.C. at 755. Further, the court pointed out, § 501(m)(3)(C) maintains an exemption for insurance provided by an association of churches for its members (or individual churches for themselves). This type of insurance certainly would not be available to the general public, and thus an interpretation of the phrase "providing commercial-type insurance" that was limited to institutions offering insurance to the general public would render that subsection a nullity. It is much more logical to read the phrase "commercial-type insurance" as referring to insurance that is generally commercially available—or, as the House report put it, "any insurance of a type provided by commercial insurance companies." H. Rep. 99-426, at 665 (1985). Even though FICURMA offers insurance only to its members, it is a type of insurance otherwise provided by commercial insurance companies—indeed, prior to FICURMA's incorporation, at least some members acquired equivalent insurance through commercial insurance companies. FICURMA thus "provid[es] commercial-type insurance."

Equally convincing is an analysis of the statutory framework. Statutory provisions like § 501(m) must be read in concert with their sister provisions, in this case § 501(n). *See Stafford v.*

*Briggs*, 444 U.S. 527, 535 (1980). Section 501(n)(1)(B) provides that § 501(m) "shall not apply to a qualified charitable risk pool," which is a pool that is "organized and operated solely to pool insurable risks of . . . organizations described in subsection (c)(3)" and that meets other requirements, *see* 26 U.S.C. § 501(n)(2). Those other requirements include the receipt of at least $1,000,000 in startup capital from nonmember charitable organizations. *Id.* § 501(n)(3)(C). FICURMA appears to meet most, if not all, of the requirements of § 501(n), except that it failed to raise the requisite charitable startup capital. The IRS argues that this failure is dispositive, because § 501(n) provides the sole method through which a risk pool such as FICURMA can gain tax-exempt status. FICURMA in turn labels the subsection a safe-harbor provision; although § 501(n) automatically bestows exemption on any organization that can meet its criteria, if an organization such as FICURMA falls short but is not within § 501(m)'s scope, it is still exempt.

Although logically possible, FICURMA's position requires a tortured reading of the tax code. Essentially, FICURMA's position is as follows. Section 501(m) bars from exemption risk pools that have certain qualities, primarily the presence of advertising, marketing, underwriting, and sales to the general public (or a sufficiently large number of members). It does not bar from exemption risk pools that, like FICURMA, lack those qualities. Section 501(n) restores exemptions for risk pools that have the frowned-upon qualities. It has no effect on risk pools that do not run afoul of § 501(m). Since FICURMA does not run afoul of § 501(m), its inability to meet § 501(n)'s requirements is of no matter. But this position makes no sense. It envisions a wrath of institutions that are like FICURMA in that they are comprised of tax-exempt organizations and incorporated in order to pool their members' risk, but that are unlike FICURMA in that they engage in the sorts of "commercial" activities that FICURMA argues are

necessary for an organization to fall under § 501(m); these are the only institutions that could benefit from § 501(n), under FICURMA's reading of § 501(m).  And there are no indications that any such institutions exist.  The concept of a risk pool comprised of tax-exempt institutions that nonetheless is large enough, does enough of its own self-insuring and underwriting, and advertises and markets enough to make its activities fall within the rubric of what FICURMA understands "providing commercial-type insurance" to mean borders on paradoxical.  The Court is skeptical that Congress would have passed § 501(n) solely to target such a rare breed of organization.  The Court is instead confident that, as the *Paratransit* court found, Congress in passing § 501(m) intended that risk pools of all kinds would be barred from exemption, and later passed § 501(n) as a limited exception to § 501(m).

FICURMA urges the Court not to adopt this position because, it says, such a reading would render § 501(m) unconstitutional.  Under the Court's reading of the statute, § 501(m) bars risk pools like FICURMA from tax exemption.  Section 501(m)(3)(C) restores tax exemption, however, for "a church or convention or association of churches" that provides itself or themselves with property or casualty insurance.  According to FICURMA, this preferential treatment for religious organizations violates the Establishment Clause of the First Amendment, and the Court should adopt FICURMA reading of § 501(m) to avoid this constitutional issue. *See Jones v. United States*, 529 U.S. 848, 857 (2000) ("[W]here a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.").

The canon of constitutional avoidance is inapplicable here for two reasons.  First, it has effect only when a statute is "reasonably susceptible of two interpretations," *United States ex rel. Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 407 (1909), and the Court does not find

FICURMA's interpretation reasonable. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) ("The canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction."). Second, even if the Court were to adopt FICURMA's interpretation, that interpretation would not cure the alleged constitutional defect. FICURMA's position is in essence that "providing commercial-type insurance" only refers to the sale, underwriting, advertising, and marketing of insurance to a sufficiently wide audience. Under that reading of the term, an otherwise exempt non-profit similar to FICURMA that sells, underwrites, advertises, and markets insurance to its large assortment of members would be unable to qualify for an exemption. However, a non-profit association of churches that sells, underwrites, advertises, and markets insurance to its large assortment of members would qualify for exemption under § 501(m)(3)(C). These hypothetical similarly situated non-profits would still face unequal treatment under the tax code, and the constitutional issue of preferential treatment for religious institutions would remain present. The canon of constitutional doubt therefore does not counsel adoption of FICURMA's argument.[5]

### III. CONCLUSION

FICURMA "provides commercial-type insurance" under the meaning of 26 U.S.C. § 501(m)(1), and is therefore subject to taxation unless it meets the requirements of § 501(m)(3) or

---

[5] The parties argue for and against constitutionality by citation to *Walz v. Tax Com. of New York*, 397 U.S. 664 (1970), and *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), respectively. The lessons of these two cases are, unfortunately, vague. On the one hand, tax exemptions do not involve excessive "entanglement" between the state and religion and do not have the primary effect of advancing religion, *see Walz*, 397 U.S. at 672-675; *cf. Lemon v. Kurtzman*, 403 U.S. 602 (1971). However, a legislature may not grant a tax exemption *solely* to a religious organization or organizations. *See Texas Monthly*, 489 U.S. at 15-16. And if an exemption is aimed at activities that directly promote proselytization, the exemption is more likely to be unconstitutional. *Id.* at 14 & n.5.

Section 501(m)(3)(C) applies to the provision of insurance, which is divorced from the promulgation of religious faith. However, the range of secular institutions also eligible for exemption notwithstanding § 501(m) is relatively narrow: insurance provided "substantially below cost," 26 U.S.C. § 501(m)(3)(A); "incidental health insurance provided by a health maintenance organization," i*d.* § 501(m)(3)(B); a "charitable gift annuity," *id.* §§ 501(m)(3)(E), 501(m)(5); and a "qualified charitable risk pool," *id.* § 501(n). Whether this range is sufficiently narrow as to violate the Establishment Clause under *Walz* and *Texas Monthly* is an issue the Court has no occasion to decide today.

11

(n). It does not. The IRS thus appropriately determined that FICURMA is not eligible for exemption, and FICURMA is not entitled to a declaratory judgment otherwise. An appropriate Order accompanies this Memorandum Opinion.[6]

Signed by Royce C. Lamberth, Chief Judge, on March 22, 2012.

---

[6] The parties do not allege the existence of a genuine issue of material fact, and the Court finds none.